IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

           Plaintiff,

vs.                                              Case No.  24-CR-546 KWR

ORLYN VIGIL,

           Defendant.

**SENTENCE MEMORANDUM AND REQUEST FOR VARIANCE**

Orlyn Vigil, by and through his undersigned counsel, Dennis J. Candelaria, respectfully submits this sentencing memorandum and request for variance. Mr. Vigil requests that this Court accept the plea agreement and vary to a sentence of 5 years probation. A sentence that is better reflective of this man that is before this Court after making significant life changes. There are no objections to the presentence investigation report.

    I.      Argument

A court shall impose a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. Section 3553. "It has been uniformed and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometime magnify, the crime and the punishment to ensue."

*Koons v. United States*, 518 U.S. 81, 113 (1996). The established tradition of sentencing in federal court is that **"the punishment should fit the offender and not merely the crime."** *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (Emphasis added). A sentencing court should "engage in a holistic inquiry of the Section 3553(a) factors. *United States v. Barnes*, 890 F. 3d 910, 916 (10th Cir. 2018).

One of the factors a court must consider during sentencing is the guideline range. *See* § 3553(a)(4). "Congress established the sentencing guidelines to provide objective benchmarks for the selection of an appropriate sentence." *United States v. Walker*, 844 F.3d 1253, 1258 (10th Cir. 2017). The analysis of a sentence must start from the correctly calculated guideline range. "[A] sentence within the correctly determined advisory guidelines range is entitled to a rebuttable presumption of reasonableness." *United States v. Mateo*, 471 F. 3d 1162, 1169 (10th Cir. 2006). While a sentence within the guidelines is presumptively reasonable, a court may vary after consideration of all the sentencing factors.

**II.    Orlyn Vigil**

Mr. Vigil requests this Court to accept the 11(c)(1)(C) plea agreement and find a variance outside of applicable guideline range is appropriate. He is before the Court because he made multiple decisions that were selfish. He regrets these mistakes and accepts responsibility. His life is not defined by this crime and to better understand why he committed this crime; it is important that this Court be introduced to a man who was born and raised northern New Mexico.

Mr. Vigil was born in Farmington, New Mexico. He was raised in Dulce, New

Mexico within the Jicarilla Apache Nation. The Jicarilla Apache Nation is a community located in Southern Colorado and Northern New Mexico at the base of the Sangre de Cristo Mountain range. This community is over 1,000 years old.

The land that was designated as a reservation was not suitable for agriculture. However, the tribe was able to sell timber and ranch sheep. It wasn't until the 1920s that the tribe learned that the land was rich in oil and gas. In 1982, the U.S. Supreme Court ruled that the tribe had the authority to impose severance taxes on oil companies drilling for oil and gas on reservation land. (See *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130) This decision changed the Nation. It opened up the Navajo Nation to tourism, schools, and jobs.

Mr. Vigil's parents and Mr. Vigil were raised just before this change. His life was considerably different than the next generation. They were poor despite working full time. His house was on Arapahoe Street. It was known locally as "ghost town." His house was a two-story home at the end of a paved road. His parents had their own room. The six kids shared rooms with four boys in one room and the two girls in the other. The family grew up on rice, beans and tortillas. When his dad lived in the house, his parents were able to pay the gas, electricity, and water. When his dad was kicked out, his mom was a single parent raising six children. His mom had a really hard time stretching a dollar. "Sometimes we had electricity, sometimes not."

His parents were alcoholics. Every weekend they would leave the house and disappear for a few hours. They came home drunk. Even as a young kid, Mr. Vigil (and his siblings) could recognize the stagger, the loud voices, and the slurred speech. These

were signs that his parents were in the mood to fight. Mr. Vigil's older sister, Aldean, would gather the younger kids. She would rush them upstairs and cover their ears. Despite her best attempts to shield the kids, Mr. Vigil could still hear the cussing, the slapping, and the hitting. The next morning, he would walk into his mom's room as she tried to clean off the blood or clean up the broken glass or knocked over furniture.

After every fight, his dad would leave or his mom would kick him out of the house. By the start of the week, he was back. Mr. Vigil was too young to remember what was the catalyst that stopped his dad from ever coming back. However, he remembers his dad leaving and never coming back. He sat at his bedside next to his window and looked outside waiting for his dad's truck to drive up the road. It never happened. He would see his dad around town, he would run to him and ask him… "when are you coming back home?" His dad just patted him on the back and told him… "things change." He still vividly recalls his dad's words.

Meanwhile, his mom was now a single parent raising six children. The three oldest children took care of the three youngest. They cooked, washed clothes, and made sure that the youngest kids were dressed and ready for school. Mr. Vigil was the youngest of six. Mom was too busy working to tend to the basic needs of six kids. Mr. Vigil has a special place for his oldest sister Aldean. She was his second mom. He recognizes that Aldean never graduated high school because she was too busy taking care of him.

Growing up with a single mom was extremely difficult. It was exponentially worse when your mom was an alcoholic. His mom relied heavily on the older kids to take care of the house. She could leave and be gone for a couple of days. When pressed as to where

she was and with whom, she wouldn't say anything. She told her kids that it was none of their business. On the weekends, she would go to the bars and "she would bring the party back." She would come home with family, friends, or guys that she just met at the bar. She would tell the kids to go upstairs. Mr. Vigil remembers sitting on the stairs and watching the party. The drinking, the laughing, the hollering, it looked like a lot of fun.

Mr. Vigil's mom drank and suffered hangovers the next day. When she awoke the following day, she would be angry for no reason or any reason. She would go into the kids' rooms and wake them. She would yell at them and if they gave her any sass, she would "whip the shit out of us. She would allow us to pick our weapon…the extension cord, the broom stick, or the big piece of wood. She didn't hit us on our butt. She would hit us across the legs and the back." The whippings lasted for years. Aldean did her best to shield the kids from the beatings until her mom kicked her out of the house. Then the whippings resumed. To escape his mom's wrath, he would sneak out of his bedroom window, jump on his horse, and retreat to the mountainside. He would hole up on the mountainside long enough for his mom to sober up or fall asleep. Even though he hated the beatings, he learned to "endure the pain."

Once the kids got older and could fend for themselves, they stopped their mom's whipping. They did so with vengeance. If their mom tried to raise a hand to them, they would hit her first or challenge her. "She deserved it." (*See* PSR ¶ 43) However, she was still their mom. Inside the house there may have been complete turmoil, however, the children knew that mom was doing her best. When a neighborhood kid called Mr. Vigil's mom a "fucking bitch," Mr. Vigil knew he would never let that happen again. As mean as

she could be, she was still his mom.

Mr. Vigil went to elementary school in Dulce. He would go to school with his older cousin. His cousin was supposed to walk with him to school and take care of him. Unfortunately, he was one of his biggest tormentors. "He would kick me in the dick. First thing in the morning, then in the afternoon, then on the way home." Mr. Vigil has no answer about why his cousin felt it necessary to torment him. While at school, Mr. Vigil was teased by the other kids. He was poor so he wore hand-me-downs. He wore clothes that were too big, too small or torn. "We wore the same fucking clothes for years." He hated school.

When Children Youth and Families was called about the abuse and living conditions at his house, he was sent to go to school and lived at "the dorm." It was a boarding school for Natives who were taken from their parents. While living at the dorm, he was teased from elementary to high school. He didn't know math; he couldn't focus on reading. He would go to school and wait for the opportunity to ditch. Finally, he dropped out of school in the 10th grade. He went home and cried. His older brother told him that "only women cry." He needed to be stronger.

Mr. Vigil learned one thing in High School was that he liked to run. He found solace in running. He was able to find his thoughts. He was able to lose himself and get away from the cruelty of his "friends" in school. He migrated to being a better Indian. He found time with his dad. His dad taught him the "Bear Dance" and bought him a belt with bells. Mr. Vigil danced and afterward, his dad told him for the first time that he was proud of him. "I was no longer a waste of space."

☐

Mr. Vigil's life has always been around alcohol. His mom's boyfriend would lay a mattress down in the back of his F-150 Ford pickup truck. Each kid had a sleeping bag and pillow. Then his mom would take the kids to the bar and park outside. She and her boyfriend would stay the next 4 or 5 hours at the bar. Occasionally, stepping outside to check on the kids. Give them a soda and a bag of chips. If the bar were closed, the party was at the lake, a house, or the river. The alcohol fueled fights… man against man, woman against woman, and man against woman. When Mr. Vigil grew older, he was snared. He drank all the time. You couldn't give him a pint. He wanted a fifth or two fifths of whiskey. He drank every day all day. By nineteen years old, he was an alcoholic.

Mr. Vigil's alcoholism took a toll on his family and friends. His sisters pleaded for him to get into counseling. He was angry. He asked his mom… "why did you make me this way? Why are we so poor? Why did you put me through all this?" Mr. Vigil's questions were never answered. He tried finding an answer in the bottom of a bottle. Despite his outer toughness, he was a good guy with a decent soul. Jane Doe saw the goodness in him.

In 2014, Mr. Vigil and Jane Doe married. From this relationship, they have five children. Their relationship has been strained as Mr. Vigil came into this relationship with alcohol addiction and mental issues. His arrests and convictions appear to be alcohol related. He lost "years of his life drinking." (PSR ¶66) Just when it appeared to be that Mr. Vigil would not change, he had a spiritual moment. He landed in the hospital after a heavy night of drinking. He was throwing up blood. He recognized that the path he had chosen would end in the graveyard. Starting in 2017, he started participating in domestic

violence education groups. He engaged in individual counseling to resolve drinking and anger issues through the Jicarilla Behavioral Health Clinic. (See Exhibits 1 and 2)

In 2021, he was arrested for the present case. He pleaded guilty and was sentenced in the Jicarilla Apache Tribal Court. He was sentenced to a total of one year (suspended) with conditions of probation. His conditions of probation included no contact with the victim for one year. He abided by that condition and during that time he was not allowed back into his house. He attended parenting classes, anger management classes, substance abuse classes, and alcoholic anonymous classes. Presently, he has completed 3 cycles of counseling that include group and individual counseling. He most recently completed a series of 12 individual treatments sessions that concluded on January 15, 2025. In March 2023, he lived with his wife and family without incident before he was arrested on these same charges in federal court.

On May 24, 2024, Mr. Vigil was released under conditions of supervision. He has remained on pretrial services supervision and is employed full time at the Jicarilla Apache Utility Authority in Dulce, New Mexico. He is a valued employee. He has been in complete compliance with his conditions of supervision. He has devoted his time to helping others stay sober. (See PSR ¶ 70). Mr. Vigil would like to give a special thanks to Craig Munson his counselor at the Jicarilla Clinic and Chuck the counselor at Cottonwood Clinical Services. He credits these two individuals as the two people who finally listened to him. He credits Chuck with "hitting all the A's, B's and C's" of his mental health problems. He was like "Yoda".

The fact is that Mr. Vigil still has a long road of sobriety. Presently, he is on the right

path. He would like to apologize to Jane Doe. Not just for the present offence, but for "all the shit that I put her through." Jane Doe is a survivor. He apologizes to this Court, his community, and his family. Most of all he apologizes to his wife. Mr. Vigil's life pattern provides the most hope for his future and in no small way, most strongly indicates the appropriateness of a sentence of probation. These are the factors that justify a variance and compel the finding that a sentence is reasonable and not greater than necessary to reflect the goals of all the statutory requirements under § 3553 factors.

    Wherefore, Mr. Vigil respectfully requests that this Court find that a variance is justified in this case, accept the plea agreements, and sentence Mr. Vigil to probation.

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

*Electronically filed April 28, 2025*
/s/ Dennis J Candelaria
Assistant Federal Public Defender